J-A10041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.R.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2824 EDA 2017 |

Appeal from the Decree Entered August 7, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000517-2017,
CP-51-DP-0003278-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: Ga.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2826 EDA 2017 |

Appeal from the Decree Entered August 7, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000518-2017,
CP-51-DP-0123527-2009

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2827 EDA 2017 |

Appeal from the Decree Entered August 7, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000519-2017,

J-A10041-18

| | | |
|---|---|---|
| IN THE INTEREST OF: H.R.N., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.N., FATHER | : : : : : : : : | |
| | : | No. 2828 EDA 2017 |

Appeal from the Decree Entered August 7, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000711-2017,
CP-51-DP-0001197-2017

BEFORE: GANTMAN, P.J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.: **FILED JUNE 08, 2018**

Appellant, G.N. ("Father"), appeals from the decrees of the Family Court Division of the Court of Common Pleas of Philadelphia County, entered August 7, 2017, that terminated his parental rights to his children, L.R.N. (born May 2006), Ga.N. (born April 2008), R.R.N. (born March 2014), and H.R.N. (born April 2017) (collectively, "the Children"), and from the orders of the same court and entered on the same date that changed the permanency goal for the Children from reunification with their biological parents, Father and K.T. ("Mother"), to adoption. We vacate the decrees terminating Father's parental rights to L.R.N., Ga.N., and R.R.N. and remand to the trial court for additional proceedings consistent with this decision. We reverse the decree

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

terminating Father's parental rights to H.R.N. We vacate the orders changing the permanency goal for all four of the Children from reunification to adoption and remand to the trial court for additional proceedings consistent with this decision.[1] In addition, we specifically direct that these additional proceedings be held within sixty days of the filing of this memorandum.

In December 2009, the Department of Human Services ("DHS") obtained an order of protective custody ("OPC") for L.R.N. and for Ga.N., and they were placed with their maternal grandparents. In January 2010, they were adjudicated dependent.[2] In December 2011, L.R.N. and Ga.N. were reunified with Mother and Father (collectively, "the Parents"). All court supervision was terminated in March 2012.

In December 2015, L.R.N., Ga.N., and R.R.N.[3] were adjudicated dependent. In April 2016, DHS obtained OPCs for L.R.N., Ga.N., and R.R.N., and they were placed in foster care.

---

[1] We leave undisturbed the orders finding the Children dependent and establishing the Children's foster/pre-adoptive placement.

[2] The dependency order stated that L.R.N. and Ga.N. "may be placed with Mother once it is deemed appropriate." However, the record is vague as to whether L.R.N. and Ga.N. were ever returned to Mother, who was living in a shelter; at the time of the subsequent permanency review hearing in June 2010, L.R.N. and Ga.N. were residing with maternal grandmother.

[3] R.R.N. was born in March 2014.

H.R.N. was born in April 2017. Before and immediately after H.R.N. was born, Mother was living with her maternal aunt, not with Father. Notes of Testimony (N. T.), 8/7/17, at 38, 87, 97-98. On May 4, 2017, DHS obtained an OPC for H.R.N., removed H.R.N. directly from the hospital after she was born, and placed H.R.N. with Mother's relatives.[4] In order for H.R.N. to be placed with her maternal aunt in kinship care, Mother moved out of the aunt's home and into Father's home.

On May 5, 2017, DHS filed petitions to terminate the Parents' parental rights to L.R.N., Ga.N., and R.R.N. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b) and to change their permanency goal from reunification to adoption.

On May 11, 2017, H.R.N. was adjudicated dependent. In July 2017, DHS petitioned to terminate the Parents' parental rights to H.R.N. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (4), (5), (8) and (b) and to change her permanency goal from reunification to adoption. A permanency hearing was scheduled for later in July but was continued, because the trial judge was unavailable.

In August 2017, the trial court held a hearing on both the termination and goal change petitions. At the beginning of the hearing, Mother's counsel

---

[4] The OPC for H.R.N. was ordered by the Honorable Jonathan Q. Irvine; other decisions in these actions, including the orders and decrees at issue, were made by the Honorable Lyris Younge.

and the child advocate represented that then-eleven-year-old L.R.N. and then-nine-year-old Ga.N. wanted to testify in court, but the trial court denied this request, explaining that it did not permit such young children to testify at a goal change "[u]nless there's extenuating circumstances." N. T. at 4-7. Additionally, while the trial court was provided with copies of the dependency dockets, there was no stipulation as to the statement of facts that accompanied the termination of parental rights petitions – *i.e.*, while there was no dispute as to the procedural history of the Children's dependency actions, there was also no agreement as to the facts represented by DHS in its termination petition. *Id.* at 9-12.

DHS presented the testimony of two caseworkers from the Community Umbrella Agency ("CUA"), Turning Points 3. The first caseworker, Althua Derricotte,[5] had supervised this family's case from November 2016 to May 2017. She testified that Mother has failed to demonstrate an ability to maintain sobriety or mental health stability for any extended period of time. *Id.* at 27, 33. When Ms. Derricotte was asked, "Do you have a concern that [Father] may minimize [M]other's dual diagnosis[6] issues," she answered, "Yes." *Id.* at 38. Later, the following exchanges occurred with Ms. Derricotte:

---

[5] The notes of testimony indicate that the name of this witness was spelled phonetically therein. N. T. at 2.

[6] In this context, "dual diagnosis" refers to a diagnosis for both drug and alcohol abuse.

> [**Q.**] . . . [Would Father] be able to provide a safe living environment given his dynamic with [M]other while her issues are unaddressed?
>
> **THE WITNESS:** No.

*Id.* at 38-39. Ms. Derricotte testified that Father's single case plan objectives were completing parenting classes, obtaining appropriate housing, and attending all scheduled visitation with the Children. *Id.* at 37, 55-56. She confirmed that Father had finished his parenting classes, had appeared at all scheduled visits, and was employed.

Ms. Derricotte testified that Ga.N. "has behavioral health medication management through his pediatrician" and goes to therapy biweekly at PATH,[7] but he has never had any psychiatric hospitalization, significant crisis, or "302 episode" after entering care.[8] *Id.* at 41, 43-44. She stated that L.R.N. does not have any special needs or services and was promoted to the sixth grade for regular education. *Id.* at 44-45. She also testified that R.R.N.[9] has not

---

[7] PATH (People Acting To Help), Inc., is a comprehensive behavioral, mental health, and intellectual disabilities center located in Philadelphia.

[8] "302 episode" refers to Section 302 of the Mental Health Procedures Act, 50 P.S. §§ 7101-7503, which controls involuntary emergency examination and treatment authorized by a physician and not to exceed 120 hours. *Id.* § 7302.

[9] The notes of testimony state: "[H.R.N.] is 3 and a half and has been in care for her life, fair to say?" N. T. at 46. However, at the time of the hearing, R.R.N. was about three-and-a-half years old; H.R.N. was approximately three months old. We believe that the use of H.R.N.'s name was therefore an error. Also, unless the questions on page 46 refer to R.R.N. and not H.R.N., then there is no inquiry about R.R.N.

had any hospitalizations or special mental health services and does not have any special medical needs. *Id.* at 46.

When asked if she "believe[d] it would harm [Ga.N.] beyond repair if either of his parents['] rights were terminated by the [trial c]ourt," Ms. Derricotte answered, "Yes." *Id.* at 43. When later asked if she "believe[d] that it would cause . . . [Ga.N.] severe psychiatric distress if the [trial c]ourt were to terminate parents['] rights and free him for adoption," Ms. Derricotte replied, "No." *Id.* at 44. Ms. Derricotte additionally testified that she believed that terminating the Parents' legal rights would not cause L.R.N. to have any severe mental episodes, would not cause R.R.N. to have any severe emotional distress, and would not harm H.R.N. *Id.* at 45-47. When asked to clarify her answer about L.R.N., Ms. Derricotte agreed that she had initially stated that it would cause L.R.N. "irreparable harm" if the Parents' rights were terminated, then adding: "My response was just based on how I felt, I think the kids are very bonded with their family, so, I get it. But when you talk about safety, that's different." *Id.* at 51.

Ms. Derricotte admitted that the Children were always happy to see Father and that L.R.N., Ga.N., and R.R.N. were bonded with him. *Id.* at 50.

_____

We thus also assume that the questions about "she" immediately thereafter refer to R.R.N. and not to H.R.N. *Id.* at 46. As these questions refer, in part, to mental health services, we again reason that they more logically apply to a three-and-a-half-year-old child than one who could not yet speak.

She acknowledged that, when she "spoke with the [C]hildren," "they want[ed] to be living with their parents." *Id.* at 66. However, she concluded that the Children need permanency "through adoption" and that the lack of permanency "had a detrimental effect on the [C]hildren" – without providing specifics about that "detrimental effect." *Id.* at 67-68.

The second caseworker, Lakia Stewart, testified that the Children could not be safely reunited with the Parents. *Id.* at 73 ("not today, no"). She agreed that it was in "their best interest to be freed for adoption." *Id.* at 75.[10]

Yet, Ms. Stewart testified that she had evaluated Father's home and found it safe. *Id.* at 78. She had never seen Father intoxicated or otherwise under the influence, and she knew that all of Father's drug screens had been negative. She also testified that Father was employed, had spoken to her about wanting his children back, and had completed all requested paperwork. *Id.* at 79-80. Ms. Stewart explained that, other than Mother's current presence in Father's home, the only other goal that Father had not completed was to have an "assessment for outpatient treatment," because his insurance would not pay for it. Ms. Stewart said that her CUA could not provide funding for such an assessment. She also conceded that L.R.N. has "stated that she

_____

[10] The question immediately preceding this one was about L.R.N. and Ga.N.; consequently, it is unclear whether "their best interest" referred to all of the Children or just to L.R.N. and Ga.N. N. T. at 75.

wants to return to her parents" and that Ga.N. has "expressed the same." *Id.* at 76.

The child advocate attorney made an offer of proof that L.R.N. and Ga.N. "both very much want to go home with their parents." *Id.* at 83. The child advocate also informed the trial court that L.R.N. and Ga.N. were "very bonded" with Father and "are absolutely adamant that they do not want to be adopted." *Id.* at 109-10.

Father testified that he had housing that was "fully furnished" with "beds, cribs, everything you can think of, furniture, washer and dryer." *Id.* at 84. Father testified that he has been continuously employed by the same company for over ten years, attended and received a certificate of completion for his parenting classes, and went to counseling with Ga.N. in order to understand and to manage the child's behavioral issues better. *Id.* at 84-86. Father also testified that he appeared at all visits and that the Children would "cry and be upset" when the visits ended. *Id.* at 86.

Father stated that, if the trial court ordered that Mother could not live in the same home as the Children, she "would have to move out"; Mother had the option of living with her maternal aunt. *Id.* at 87. He asserted: "[I]f it comes down to her or my kids, it's my kids." *Id.* at 90. His testimony continued:

> **Q.** Do you see [Mother] as a safety concern for any of your children?
>
> **A.** Not at all.

**Q.** Do you believe that she should have unsupervised visits with the children?

**A.** Absolutely.

**Q.** And you would permit her unsupervised contact with the children if they were returned to you today?

**A.** She has to have complete compliance with her Wedge Program[11] and no dirty urine's [sic] or anything like that.

*Id.* at 91.

Additionally, Mother testified that she had moved in with Father in May 2017. *Id.* at 97-98. She continued that she and Father had discussed the possibility of reunification only with Father and that she would not live in Father's home "if the court says it's forbidden." *Id.* at 100-01.

At the conclusion of the hearing, the trial court found the Parents not to be credible and granted DHS's petitions. *Id.* at 117. In September 2017, Father timely filed notices of appeal with statements of matters complained of on appeal; this Court consolidated Father's appeals *sua sponte*. Mother also appealed, and the trial court issued one joint opinion for Mother and Father, not separate opinions for each appeal.

On **DATE**, 2018, a different panel of this Court affirmed the termination of Mother's parental rights as to L.R.N., Ga.N., and R.R.N. but reversed the termination of Mother's parental rights as to H.R.N. *See In re H.R.N.*, Nos. 2889 EDA 2017, 2891 EDA 2017, 2894 EDA 2017 & 2897 EDA 2017

---

[11] Mother was receiving drug and alcohol treatment at Wedge Recovery Center.

(unpublished memorandum) (Pa. Super. filed **DATE**, 2018) (Mother did not raise any issues challenging the change of the Children's permanency goal from reunification to adoption).

Father now raises the following questions on appeal:

1. Did the [t]rial [c]ourt err in terminating [Father]'s parental rights under 23 Pa.C.S.[ §] 2511(a)(1), (2), (5) and (8)?[12]

2. Did the trial court err in finding that termination of the parental rights of [F]ather best served the [C]hildren's developmental, physical and emotional needs under 23 Pa.C.S.[ §] 2511(b)?

3. Did the trial court err in granting the goal change to adoption?

Father's Brief at 3 (some formatting added).

**Termination of Parental Rights**

Father first argues that the trial court erred in terminating his parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father's Brief at 6, 8.[13] For Section 2511(a), he contends that he "continually stayed engaged in his children's lives throughout the history of the case and worked on the case goals and objectives established for

_____

[12] Father's statement of questions involved did not cite to 23 Pa.C.S. § 2511(a)(4) for H.R.N. Father's Brief at 3. Nevertheless, we have chosen to consider any challenge to the trial court's findings pursuant to this subsection preserved and to address this subsection below, particularly as we recognize that the trial court's termination under subsection (a)(4) may in any event have been based on a clerical error.

[13] Again, Father fails to reference 23 Pa.C.S. § 2511(a)(4) for H.R.N. Father's Brief at 6-7.

reunification." *Id.* at 7.[14]  For Section 2511(b), Father maintains that "the trial court err[ed] in finding that termination of [his] parental rights . . . best served the [C]hildren's developmental, physical and emotional needs[.]" *Id.* at 8.

DHS answers that Father "repeatedly and continually failed to recognize the safety concerns and risks [M]other, K.T., posed to the [C]hildren as a result of her inability to maintain her sobriety or mental health stability." DHS's Brief at 8.  DHS asks this Court to affirm "to afford each child the opportunity for permanency through adoption." *Id.* at 17.

We consider Father's challenge in light of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[14] Father also argues that he "never indicated to DHS or to the [t]rial [c]ourt that he wanted to voluntarily relinquish his parental rights[,]" Father's Brief at 7, although neither DHS nor the trial court ever stated that Father made such an assertion.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, brackets, and quotation marks omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009); *see also In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (party seeking termination of parent's rights bears burden of proving grounds to do so by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue" (quoting *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

> [The court must c]arefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the

- 13 -

tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, **must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.**

*In re Adoption of G.L.L.*, 124 A.3d 344, 347 (Pa. Super. 2015) (emphasis in original) (citation and internal brackets omitted).

We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), and its decision as to § 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, we consider the trial court's decision to terminate Father's parental rights as to L.R.N., Ga.N., and R.R.N. under subsections 2511(a)(1)-(2), (5), (8) and (b); for H.R.N., in addition to these subsections, we also consider subsection 2511(a)(4). These subsections provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*

- 14 -

(4) The child is in the custody of an agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1)-(2), (4)-(5), (8) & (b).

*H.R.N.*

With respect to the trial court's decision to terminate Father's parental rights to his youngest child, H.R.N., we must agree with the assessment of the panel of this Court that decided Mother's appeal and reverse.  As our honorable colleagues explained:

> Initially, we recognize that the trial court's termination under subsection (a)(4) may be based a clerical error.  Section 2511(a)(4) provides:  "The child is in the custody of the agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found."  This section does not apply to the facts of this case.  Perhaps the termination provision was included in DHS's petition to terminate the parental rights of the "Unknown Father."  *See* 23 Pa.C.S.A. § 2512(c) ("If the petition does not identify the father of the child, it shall state whether a claim of paternity has been filed under section [5103] (relating to paternity)).  Curiously, DHS sought – and the trial court granted – termination of the rights of an unnamed father, despite the fact that Father acknowledged paternity of H.R.N., and despite the fact that he and Mother were purportedly married at the time of H.R.N.'s birth.  We can surmise no other explanation for this finding other than a clerical error.  However, the law does not sever the parent-child bond on this basis.
>
> Similarly inappropriate are the court's findings as to sections 2511(a)(1), (5), and (8).  Each of these provisions have timing requirements before termination is appropriate; the statutory requisite timeframe outlined for Sections 2511(a)(1) and (5) is six months, and for Section 2511(a)(8), it is 12 months.  At the time of the termination hearing, H.R.N. was only three months old, and, thus, could only have been without parental care for a period of approximately 3 months.

*H.R.N.*, Nos. 2889 EDA 2017, 2891 EDA 2017, 2894 EDA 2017 & 2897 EDA 2017 at 14-15.  We merely add that Section 2511(a)(1) states that the "rights of a parent in regard to a child may be terminated" if  the "parent by conduct

continuing for a period of **at least six months *immediately preceding* the filing of the petition** either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1) (emphasis added). H.R.N. was born in April 2017; the petition to terminate Father's parental rights to H.R.N. was filed in May 2017. Thus, Father's conduct could not have continued for more than six months **preceding** the filing of the termination petition, because H.R.N. had only been alive about one month when the petition was filed.

As our honorable colleagues concluded for Mother, ***H.R.N.***, Nos. 2889 EDA 2017, 2891 EDA 2017, 2894 EDA 2017 & 2897 EDA 2017 at 15, we likewise hold that the trial court erred when it terminated Father's parental rights to H.R.N. under 23 Pa.C.S. § 2511(a)(1), (4), (5), and (8), for the same reasons. We are thus left with 23 Pa.C.S. § 2511(a)(2) as a potential appropriate ground for termination of Father's rights to H.R.N.

Again, as our honorable colleagues observed:

Significantly, unlike some of the other subsections of 2511(a),[3] the legislature did not impose any minimum timeframe for termination under subsection 2511(a)(2); nor do we. We are not deciding that three months is too short of a time period for a parent to demonstrate "repeated and continued incapacity, abuse, neglect or refusal" to care for a child. ***See*** 23 Pa.C.S.A. § 2511(a)(2).

[3] ***See*** 23 Pa.C.S.A. § 2511(a)(1), (4), (5), (6), (8).

***H.R.N.***, Nos. 2889 EDA 2017, 2891 EDA 2017, 2894 EDA 2017 & 2897 EDA 2017 at 16. Like our colleagues, we are constrained to reverse in this case, because the record is devoid of any real discussion of H.R.N. or Father's

reunification efforts since H.R.N.'s birth. "The DHS Petition to terminate parental rights to H.R.N. was largely an afterthought." *Id.* at 17. H.R.N. was adjudicated dependent in May 2017. A permanency hearing was scheduled for later in July but was continued, because the trial judge was unavailable. Hence, no permanency review occurred between the dependency adjudication in May and the termination and goal change hearing in August. During that August hearing, the testimony of the DHS witnesses focused primarily on Mother and the three older children. The facts presented were insufficient to prove any "repeated and continued" conduct with respect to H.R.N. by clear and convincing evidence. *See D.L.B.*, 166 A.3d at 326; *R.N.J.*, 985 A.2d at 276. We therefore reverse the decree terminating Father's parental rights to H.R.N. pursuant to Section 2511(a).

### L.R.N., Ga.N., and R.R.N.

Next, we consider the trial court's decision to terminate Father's parental rights to L.R.N., Ga.N., and R.R.N. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8).[15] While it is clear that Mother and Father have sometimes lived together during the course of the Children's lives, the record is ambiguous as to whether L.R.N., Ga.N., and R.R.N. were living with Father at the time the most recent OPCs were entered. For 23 Pa.C.S. § 2511(a)(5)

---

[15] In its brief to this Court, DHS only presents an argument pursuant to 23 Pa.C.S. § 2511(a)(2) and not the other three subsections. DHS's Brief at 10-12.

and (8), children have to have "**been removed from the care of the parent by the court or under a voluntary agreement with an agency**" (emphasis added). Here, as we are unable to definitively determine whether L.R.N., Ga.N., and R.R.N. were removed from Father's care, we cannot agree that Section 2511(a)(5) and Section 2511(a)(8) apply to Father.[16]

In any event, the trial court's opinion provides no analysis for subsections (a)(5) and (8), thereby precluding our ability to review its rationale pursuant to those two subsections for L.R.N., Ga.N., and R.R.N. *See* Trial Court Opinion (TCO), 12/1/17, at 9.

Hence, we turn to the remaining subsections of 2511(a) – (1) and (2). This Court has explained the distinction between these two subsections. "[S]ubsection (a)(1) . . . emphasize[s] a parent's refusal or failure to perform parental duties[.]" *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "[S]incere efforts to perform parental duties can preserve parental rights under subsection (a)(1)[.]" *Id.* (citations and internal quotation marks omitted).

> [S]ubsection (a)(2) . . . instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts

---

[16] Although we have already found 23 Pa.C.S. § 2511(a)(5) and (8) inapplicable to H.R.N. on other grounds, we still note that the evidence is undisputed that H.R.N. was never in Father's care, as this youngest child went directly from the hospital after birth into DHS's custody. Thus, those subsections are decidedly inapplicable to H.R.N., because she was not "removed from the care of" Father.

to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*Id.* (emphasis omitted) (citation omitted). Sincere efforts to perform parental duties "may be insufficient to remedy parental incapacity under subsection (a)(2)." *Id.* (citations omitted).

[An] appropriate reading of [Section 2511(a)(2)] is that when a parent has demonstrated a continued inability to conduct his life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* at 1118 (citation and internal ellipsis omitted).

Here, the trial court's analysis that Father "failed to perform parental duties"[17] pursuant to 23 Pa.C.S. § 2511(a)(1) is as follows:

The [trial c]ourt found by clear and convincing evidence that Mother and Father refused or failed to perform her [sic] parental duties. . . . [T]he social worker testified the Single Case Plan objective[s] for Father were parenting [classes], housing and visits. Father continued to minimize Mother's dual diagnosis issues[. ]Father would not be able to provide a safe housing and living environment due to his relationship with Mother. . . .

In the present matter, during the seven[-]and[-a-]half years [that] the older children have been in DHS care, testimony of social worker stated Mother and Father's behavior necessitated several changes in the children's placement on several occasions.

_____

[17] The record cannot support a finding that Father's "settled purpose" was to "relinquish[] parental claim to" the Children, 23 Pa.C.S. § 2511(a)(1), because he has continued to perform all tasks requested of him by DHS, has constantly fought all legal attempts to remove the Children from his care, and is currently appealing the termination of his parental rights.

- 20 -

. . .

> Father testified he believed Mother should have unsupervised visits with [the Children]. Furthermore, Father testified he did not believe Mother was . . . a safety concern for the [C]hildren.

TCO at 8-9[18] (citations to the record omitted[19]); **accord** N. T. at 37-39, 55, 91. Thus, the trial court's entire analysis for Father pursuant to 23 Pa.C.S. § 2511(a)(1) focuses on safety concerns. However, as explained above, these are inappropriate considerations for 23 Pa.C.S. § 2511(a)(1) and should be reserved for any analysis under 23 Pa.C.S. § 2511(a)(2). **See Z.P.**, 994 A.2d at 1117-18; **see also In re M.T.**, 101 A.3d 1163, 1180 (Pa. Super. 2014) (*en banc*) (safety concerns appropriate for analysis pursuant to 23 Pa.C.S. § 2511(a)(2)). Thus, the trial court's analysis for 23 Pa.C.S. § 2511(a)(1) as to Father, which is limited to safety issues, is inappropriate and misguided.[20]

---

[18] This quotation is the trial court's analysis of Father pursuant to 23 Pa.C.S. § 2511(a)(1) in its entirety. All ellipses that appear within this block quote remove citations to case law or analysis limited to Mother. As noted above, the trial court had issued one joint opinion for Father's and Mother's appeals.

[19] The reason we have omitted the citations from the trial court opinion in this quotation is that the page numbers referenced by the trial court do not align with the notes of testimony. This incongruity occurs throughout the trial court opinion and has encumbered our consideration of this appeal. We are bothered by the trial court's carelessness in citing to the record.

[20] We further observe that, even if these considerations of safety, security, and stability were suitable under 23 Pa.C.S. § 2511(a)(1), there are additional problems with the trial court's analysis. In brief, when the trial court states that L.R.N. and Ga.N. have been in DHS's care for seven-and-a-half years, it fails to acknowledge that L.R.N. and Ga.N. have not been continuously in DHS's care, as court supervision of them terminated in March 2012; there is

Hence, we now consider the trial court's analysis pursuant to the final subsection, 23 Pa.C.S. § 2511(a)(2). The trial court's entire analysis for Father for this subsection is as follows:

> [T]he [trial c]ourt found Father's repeated and continued failure to recognize the safety concern of Mother's parenting of [the Children] while under the influence of illegal substances. (N.T. 8/7/17, pg. 100). The [trial c]ourt reasoned Mother and Father abdicated their responsibility to [the Children] over seven and half years (N.T. 8/7/17, pgs. 98-101) The [trial c]ourt stated the children were subjected to emotional abuse due to the history of unsuccessful reunifications with Mother and Father (N.T. 8/7/17, pgs. 66-67,117)

TCO at 9.

The trial court's analysis for 23 Pa.C.S. § 2511(a)(2) therefore boils down to the fact that Father and Mother were living together at the time of

---

nothing on the dependency dockets for these two children again until December 2015.

Also, the trial court states that "Mother and Father's behavior necessitated several changes in the [C]hildren's placement on several occasions." TCO at 8. Although the trial court lists damaging and troubling behavior by Mother, it fails to articulate what behavior of **Father** caused the Children to be moved. **See id.** at 8-9. "When an agency having custody of a child petitions for termination of parental rights, the rights of the respective parents must be determined independently." **In re Burns**, 379 A.2d 535, 541 (Pa. 1977).

Additionally, not all of the changes in the Children's placement have been a result of Father's or Mother's behavior. The elder children were originally with their maternal grandmother but had to be moved due to the grandmother's health problems, not the Parents' behavior. N. T. at 39, 67. While H.R.N. was originally removed from the hospital to a maternal aunt, DHS planned to remove her so that she could be in the same household as her siblings. **Id.** at 47.

The trial court's analysis pursuant to 23 Pa.C.S. § 2511(a)(1) thus appears to lack evidentiary support.

- 22 -

the termination and goal change hearing. *Id.* Safety concerns alone may be enough to satisfy 23 Pa.C.S. § 2511(a)(2). *See M.T.*, 101 A.3d at 1168-71, 1179-80 (parents had "borderline mental capacity," with approximate intellectual capacities of a nine-year-old and a fourteen-year-old, which created difficulty in ensuring that the children were "safe in the care, custody, and control of their parents"; after twelve months in protective custody, the parents' visitation "remain[ed] fully supervised due to safety concerns," the parents often had "immature responses to [social workers] when safety concerns [were] expressed," and, "[d]espite the efforts and time investment by the service providers, there d[id] not appear to be any hope of significant improvement"; consequently, termination of parental rights under Section 2511(a)(2)[21] was appropriate).

However, "[w]hen an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently," *In re Burns*, 379 A.2d 535, 541 (Pa. 1977), and, in the current action, the trial court has not articulated any reason for being concerned about the Children's safety in Father's care, beyond the fact that Father and Mother were living together at the time of the termination and goal change hearing and Mother has been unable "to maintain sobriety or

---

[21] *M.T.* also terminated parental rights under Section 2511(a)(8). 101 A.3d at 1179. Nevertheless, in the instant matter, the evidence is insufficient to determine whether Section 2511(a)(8) could be properly applied, for the reasons explained above.

mental health stability." TCO at 9 (citing N. T. at 27). Based upon our review of the record, we fail to find any other problems with Father's parenting capabilities. According to the testimony of DHS's own witnesses, Father has completed parenting classes, attended all scheduled visitation, is employed, has never appeared inebriated or otherwise under the influence, has had negative drug screens, has obtained safe housing, and has completed all paperwork required by the CUA and DHS. N. T. at 55-56, 77-80; **see also id.** at 84-86 (Father's testimony). The burden is on DHS, as the petitioner, to prove by clear and convincing evidence that Father's parental rights should be terminated. **D.L.B.**, 166 A.3d at 326; **R.N.J.**, 985 A.2d at 276. Given this record of recurrent positive behavior, we fail to see how DHS has established by clear and convincing evidence Father's "repeated and continued incapacity, abuse, neglect or refusal" to care for the Children. 23 Pa.C.S. § 2511(a)(2).

Even the trial court's claim that the Children were subjected to "emotional abuse due to the history of unsuccessful reunifications with Mother and Father" is questionable. TCO at 9. The trial court cites to pages 66-67 and 117 of the notes of testimony in support of this assertion. Page 117 is the trial court's own summation, not evidence. On pages 67, Ms. Derricotte testified that the lack of permanency "had a detrimental effect on the [C]hildren" – without providing specifics about what that "detrimental effect" is or to which of the Children it applies. N. T. at 67. For example,

- 24 -

Ms. Derricotte does not state that the Children have had behavioral or health issues due to the previous unsuccessful reunification. *See id.*[22]

Moreover, the record does not establish that the Children "were subjected to" a "history of unsuccessful reunification**s**[.]" TCO at 9 (emphasis added). L.R.N. and Ga.N. have been removed and reunified with the Parents once before – not multiple reunification**s**; R.R.N. has never been reunified.[23]

Additionally, 23 Pa.C.S. § 2511(a)(2) requires that, not only must the petitioner establish that the "parent has demonstrated a continued inability to conduct his life in a fashion that would provide a safe environment for a child," the "behavior of the parent" must be "irremediable[.]" *Z.P.*, 994 A.2d at 1118 (citation and internal ellipsis omitted). Here, the Parents offered a solution, which, if accepted, would mean that Father's circumstances were not "irremediable[.]" *Id.* The Parents provided testimony that Mother would not

---

[22] Upon remand, DHS may expand upon these assertions, including providing specifics as to what this alleged "detrimental effect" was. For instance, we cannot tell from the record whether this "detrimental effect" includes Ga.N.'s behavioral issues, as they appear to have existed before Ga.N. was adjudicated dependent and taken into care for the second time. N. T. at 41. The remainder of the record seems to refute this claim of a "detrimental effect." According to the testimony of DHS's own witness, L.R.N. did not receive any special needs or services and her educational advancement was normal, as she was eleven years old and about to begin sixth grade at the time of the August 2017 hearing. *Id.* at 44-45. The same witness testified that R.R.N. has required no hospitalizations or special mental health services and has no special health needs. *Id.* at 46.

[23] Although we discussed H.R.N.'s circumstances in detail above, we still observe that she was never in either Mother's or Father's care in order to have a "history of unsuccessful reunifications[.]" TCO at 9.

continue to reside with Father if Father received sole custody of the Children, including that Mother had a place to stay if she were to move out of Father's home. N. T. at 38, 87, 90, 97-98, 100-01. This living arrangement – with Mother living with her maternal aunt and not with Father -- existed prior to the Parents' attempt to fulfill the order entered by the Honorable Jonathan Q. Irvine on May 4, 2017. Although the trial court did not find the Parents' testimony to be credible, TCO at 10, and we are generally required to accept the credibility determinations of the trial court, the trial court's credibility determinations **must still be supported by the record**. *T.S.M.*, 71 A.3d at 267. Here, the trial court provides no explanation, supported by the record, as to why it did not find the Parents to be credible. *See* TCO at 10. Ergo, we need not accept the trial court's credibility determinations.[24] *See T.S.M.*, 71 A.3d at 267.

In conclusion, while DHS presented some evidence in support of termination of Father's parental rights to L.R.N., Ga.N., and R.R.N. pursuant to 23 Pa.C.S. § 2511(a)(2), this modicum of evidence is insufficient to satisfy DHS's "clear and convincing" burden of proof. *D.L.B.*, 166 A.3d at 326; *R.N.J.*, 985 A.2d at 276. Accordingly, due to the inadequacy of the evidence and of the trial court's analysis of this subsection, we vacate the decrees

---

[24] Upon remand, the trial court may provide clarification as to why it found the Parents' testimony incredible and unconvincing.

terminating Father's parental rights to L.R.N., Ga.N., and R.R.N. and remand for additional findings focusing on Father.[25]

We also believe that remand is appropriate because the decision of the other panel of this Court that affirmed the termination of Mother's parental rights as to L.R.N., Ga.N., and R.R.N. changes this family's circumstances, which could impact what evidence DHS chooses to present, now that it no longer needs to produce evidence about Mother, except as such evidence relates to Father. "[T]he rights of the respective natural parents must be determined independently." **Burns**, 379 A.2d at 541.

Upon remand, the trial court may hold (an) additional hearing(s), the parties may present additional evidence and argument, and the trial court must provide additional analysis of Section 2511(a). We specifically direct that all additional proceedings be held within sixty days of the filing of this memorandum.

As we remand as to the Section 2511(a) analysis, we need not discuss the trial court's conclusions as to the bifurcated Section 2511(b) analysis. **See L.M.**, 923 A.2d at 511; **see also G.L.L.**, 124 A.3d at 347.[26]

---

[25] We mention that the focus should be on Father, because the August 2017 hearing emphasized Mother's behavior and rarely addressed Father's conduct. **See Burns**, 379 A.2d at 541 ("the rights of the respective natural parents must be determined independently").

[26] All that being said, given that we are already remanding for three of the Children and that DHS may bring a new petition for termination of Father's

parental rights to H.R.N., we feel compelled briefly to address Section 2511(b) as well, as guidance for the trial court.

The trial court's analysis as to 23 Pa.C.S. § 2511(b) for all of the Children is minimal and fails to distinguish between Mother and Father. TCO at 10. However, "[w]hen an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently." *Burns*, 379 A.2d at 541.

Additional evidence was presented as to "the nature and status of the emotional bond" between Father and the Children beyond what was cited by the trial court in its Section 2511(b) analysis. *L.M.*, 923 A.2d at 511; N. T. at 50, 109-10; TCO at 10.

More importantly, only limited and occasionally contradictory evidence, N. T. at 43-47, 51, was presented of "the effect on the [C]hild[ren] of permanently severing any such bond." *L.M.*, 923 A.2d at 511; *accord G.L.L.*, 124 A.3d at 347; *In re J.T.*, 983 A.2d 771, 776 (Pa. Super. 2009) ("trial court is required to consider whatever bonds may exist between the children and appellant, as well as the emotional effect that termination will have upon the children" (citation and internal brackets and quotation marks omitted)).

Although the trial court wrote in its analysis for 23 Pa.C.S. § 2511(b) that it "concluded the [C]hildren would not suffer irreparable or detrimental harm," TCO at 10, we are uncertain how the trial court reached this conclusion or if it directly relates to the effect of severing the emotion bonds between the Children and Father. *See, e.g.*, *In re S.D.T., Jr.*, 934 A.2d 703, 707-09 (Pa. Super. 2007) (court's conclusion that severing the bond between father and child would serve needs and welfare of child was based solely on testimony of a caseworker; record was devoid of any testimony as to how agency "learned" that it was child's disappointment with father's unfulfilled promises that triggered child's suicidal thoughts and writing, and record was deficient as to specific reasons for child's suicidal writing).

Assuming we were not already remanding pursuant to Section 2511(a), we would remand pursuant to Section 2511(b), due to the inadequacy of the trial court's analysis of this subsection. This remand for additional findings should also focus on Father, with particular attention to the effect of permanently severing the emotional bonds between Father and the Children, especially the eldest three; everyone – including the child advocate and DHS's own witness – admits these bonds are strong. N. T. at 50, 109-10. The best interest of individual children may require a different result among siblings, where one

## Goal Change from Reunification to Adoption

Finally, Father contends that the trial court abused its discretion and erred in granting DHS's petition to change the Children's permanency goal from reunification to adoption. Father's Brief at 10.

> In cases involving a court's order changing the court-ordered goal to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record.

*In re L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017) (citation and internal brackets omitted) (some formatting applied).

Father's challenge to the change of the Children's permanency goal to adoption is controlled by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375. According to 42 Pa.C.S. § 6351(e)(1), which controls permanency hearings:

> In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-

---

has a strong bond with a parent and another child does not. *See R.N.J.*, 985 A.2d 273.

appointed special advocate or other person as designated by the court.

Here, the trial court provides us with no analysis whatsoever about the goal change from reunification to adoption.[27] The record is also unclear as to what evidence was presented for the goal change petition, as compared to or in addition to the termination petition. However, the limited evidence presented was that the desired permanency goal of the Children – particularly the two eldest children, L.R.N. and Ga.N. -- is not adoption but reunification. N. T. at 66, 76, 83, 109-10. Both the child advocate and two of DHS's own witnesses, Ms. Derricotte and Ms. Stewart, agreed that the Children wanted to live with the Parents. *Id.* Nevertheless, the trial court failed to consider the Children's desired permanency goals, which is required pursuant to 42 Pa.C.S. § 6351(e)(1). Although the trial court need not acquiesce to L.R.N.'s and Ga.N.'s desires and may ultimately decide that other considerations outweigh these children's wishes, there is no indication that the trial court took the Children's requests into consideration at all.

Due to the problems with the record and the lack of analysis by the trial court of the goal change separate from its analysis for termination of parental

_____

[27] Father preserved this issue in his statement of matters complained of on appeal.

rights, **see generally** TCO,[28] we reverse the orders changing the Children's permanency goals from reunification to adoption.[29]

\* \* \*

We note that, notwithstanding our vacatur of the trial court's decrees terminating Father's parental rights as to L.R.N., Ga.N., and R.R.N., and our reversal of the decree terminating Father's parental rights as to H.R.N. and of the orders changing the Children's permanency goals, we leave undisturbed the orders finding the Children dependent and establishing the Children's foster/pre-adoptive placement. The Children shall not be returned to Father's home during the period that the trial court resolves the issues pursuant to our remand, unless the trial court orders the Children reunified with Father, ends court supervision, and/or finds the Children no longer dependent. We note that no party has sought for the Children to be returned at this time, and we

---

[28] Much of the trial court's existing analysis for the termination of parental rights would apply to the goal change, as safety is an appropriate consideration for a goal change analysis. Section 6351 of the Juvenile Act prescribes the pertinent inquiry for the reviewing court during a permanency hearing, including "[w]hether the child is safe." 42 Pa.C.S. § 6351(f)(6). Pursuant to said section, the trial court may also determine, "[i]f and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child." **Id.** § 6351(f.1)(1).

[29] We reverse without prejudice, and DHS may file new petitions to change the Children's permanency goals from reunification to adoption. At that time, the trial court may also re-consider the request to allow L.R.N. and Ga.N. to testify; such testimony may be given *in camera*. **See** N. T. at 4-7.

therefore conclude that it is in the best interests of the Children to maintain the *status quo* while the trial court acts on remand.

Furthermore, we share the concern of our honorable colleagues that this decision, like theirs, leaves this family in a fractured state. **H.R.N.**, Nos. 2889 EDA 2017, 2891 EDA 2017, 2894 EDA 2017 & 2897 EDA 2017 at 17. We are similarly "aware that the ultimate outcome might be the same" and that Father's "parental rights may eventually be terminated." **Id.** Nonetheless, we agree that "[w]ithout evidence, . . . we are reduced to mere speculation, which can never justify bypassing the heightened due process afforded to parents engaged in the juvenile court system." **Id.** at 17-18.

Reversed in part. Vacated in part. Case remanded. Jurisdiction relinquished.

Judge McLaughlin joins the memorandum.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/18

- 32 -